# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHRISTOPHER D. JONES,

Petitioner,

v.                                    Case No. 12-CV-1108

BRIAN FOSTER,[1]

Respondent.

# DECISION AND ORDER

## I.      Procedural History

Petitioner Christopher D. Jones is incarcerated at Waupun Correctional Institution (ECF No. 45 at 1), having been convicted on May 3, 2007, of first degree reckless homicide and attempted armed robbery following a jury trial in Milwaukee County Circuit Court (ECF No. 1 at 2). Jones appealed, and the Wisconsin Court of Appeals affirmed his conviction on August 24, 2010, in a published opinion. *State v. Jones*, 2010 WI App 133, 329 Wis. 2d 498, 791 N.W.2d 390. The Wisconsin Supreme Court denied Jones's petition for review on February 7, 2011. (ECF No. 21-8.) Jones returned to

---

[1] Online records of the Wisconsin Department of Correction state that the petitioner is incarcerated at Waupun Correctional Institution. The warden of that institution is currently Brian Foster. In accordance with Rule 2(a) of the Rules Governing Section 2254 Cases and Fed. R. Civ. P. 25(d), the caption is updated accordingly.

the Wisconsin Court of Appeals in April of 2012 with a *Knight* petition, *see State v. Knight*, 168 Wis. 2d 509, 484 N.W.2d 540 (1992), (ECF No. 21-20), which was denied on April 24, 2012 (ECF No. 21-21). The Wisconsin Supreme Court denied Jones's petition for review (ECF No. 21-22) on September 17, 2012 (ECF No. 21-24).

Jones, proceeding pro se, filed the present petition for a writ of habeas corpus on October 31, 2012. (ECF No. 1.) The matter was initially assigned to the Honorable Rudolph T. Randa but was reassigned to the Honorable William E. Callahan, Jr. upon all parties consenting to the full jurisdiction of a magistrate judge. (ECF No. 9.) On December 11, 2012, Judge Callahan stayed the proceedings to permit Jones to exhaust his state remedies. (ECF No. 11.)

Jones then returned to the state circuit court, where he unsuccessfully challenged his conviction pursuant to Wis. Stat. § 974.06. On appeal, the Wisconsin Court of Appeals affirmed the circuit court on November 19, 2013. (ECF No. 21-28.) The Wisconsin Supreme Court denied Jones's petition for review (ECF No. 21-29) on May 24, 2014 (ECF No. 21-31). On July 14, 2014, Jones notified Judge Callahan of the state courts' resolution of his appeal (ECF No. 13), and the stay was lifted on July 17, 2014 (ECF No. 14).

On January 22, 2015, Jones asked Judge Callahan to appoint counsel to represent him. (ECF No. 28.) Judge Callahan granted the motion on February 20, 2015. (ECF No. 31.) Shortly thereafter, Judge Callahan retired, the matter was reassigned to this court,

and all parties consented to have this court resolve the petition. (ECF Nos. 35, 36.) At the request of Jones's newly-appointed attorney (ECF No. 34), the court held a status conference to discuss further proceedings (ECF Nos. 38, 39). The court granted Jones the opportunity to file a supplemental brief in support of his petition. (ECF No. 41.) The respondent submitted a brief in opposition to the petition (ECF No. 45) and Jones replied (ECF No. 46). The petition is now ready for resolution.

## II.    Facts

Edward Hervey testified that he and Brandon Sprewer had been friends for 10 years and played basketball together in the Special Olympics. (ECF No. 21-14 at 11.) On September 5, 2006, after getting off work at Jewel Osco, Sprewer met up with Hervey. (ECF No. 21-14 at 13.) At around 9:00 PM, as they walked to catch their respective busses home (ECF No. 21-14 at 16-17), they were approached by two unknown black males near North 89th Street and West Silver Spring Drive in Milwaukee (ECF No. 21-14 at 17, 25 ). The two men asked Sprewer and Hervey if they wanted any ecstasy or weed. (ECF No. 21-14 at 17.) Sprewer and Hervey declined. (ECF No. 21-14 at 19.) Hervey and Sprewer separated and Hervey was some distance away (*see* ECF No. 21-15 at 11) when he saw one of the men, whom he later identified as Jones, pull a gun and shoot Sprewer (ECF No. 21-14 at 19-20).

Hervey's identification of the individuals involved in Sprewer's murder, although emphatic at trial (ECF No. 21-14 at 20), arose tentatively. When initially

presented with a six person sequential photographic array, Hervey did not identify anyone. (ECF No. 21-14 at 57.) He then asked to look at the photos again. (ECF No. 21-14 at 57.) When he viewed the photos a second time, he picked out two men that he said looked like a person involved in the murder of Sprewer; one was a filler, the other was Jones. (ECF No. 21-14 at 57-58.) About a month after the shooting, Hervey was shown another photographic array from which he identified D.G., a juvenile, as the person who was with Jones. (ECF No. 21-14 at 58-60.)

Jada Carter testified that she was in the area of 91st Street and Silver Spring Drive that evening waiting for the bus when she saw three men nearby. (ECF No. 21-14 at 74-76.) One of the men, whom she subsequently identified as Jones, reached for Sprewer. (ECF No. 21-14 at 76-78, 84-85.) Sprewer pulled back from Jones, said "No," and then Carter heard a pop. (ECF No. 21-14 at 77.) Sprewer fell forward; Jones ran away. (ECF No. 21-14 at 77.)

Carter's identification of Jones as the shooter resulted from a photographic array and lineup. She was shown a photo array and picked out a black male (neither Jones nor D.G.) whom she said looked like one of the persons she saw that night. (ECF No. 21-14 at 81.) Carter said she was not sure and that it would help if she could see a live lineup. (ECF No. 21-14 at 81.) A sequential lineup was conducted and Carter identified Jones. (ECF No. 21-14 at 82.) Only Jones was presented in both the photo array and the

live lineup. After the lineup, Carter was shown another photographic array from which she identified D.G. as the other person who was with Jones. (ECF No. 21-14 at 83.)

D.G. testified that he was with Jones that evening when Jones approached two black males in the area of 91st Street and asked them if they wanted to buy any ecstasy pills. (ECF No. 21-16 at 55.) They said no and Jones asked D.G. if he thought they had any money; D.G. said, "No." (ECF No. 21-16 at 55, 72.) Jones followed one of the men, confronted him, and told D.G. to grab the man's mobile phone. (ECF No. 21-16 at 57-58.) D.G. attempted to do so but the man pushed D.G. (ECF No. 21-16 at 58, 74-75.) Jones then shot the man. (ECF No. 21-16 at 58.) D.G. and Jones then fled. (ECF No. 21-16 at 59.)

Kandice[2] Perry, Jones's girlfriend at the time of the shooting, testified that she spoke with Jones that evening and he told her that he was going to commit a robbery in the area of North 91st Street and West Silver Spring Drive. (ECF No. 21-15 at 24-26.) Perry drove Jones to the area and dropped him off. (ECF No. 21-15 at 26-27.) Perry saw that Jones had a small silver handgun that she had seen him with before. (ECF No. 21-15 at 27.) Later that evening, Jones called Perry, frantic, and asked her to come get him because something went wrong. (ECF No. 21-15 at 29.) She did so, picking him up from a house in the area of the shooting, and once they returned to Perry's house Jones told her that the robbery went bad and he shot the victim. (ECF No. 21-15 at 30-31.)

---

[2] Perry testified twice and the transcript records her spelling her name first as Kandice (ECF No. 21-15 at 24) and later as Kandace (ECF No. 21-16 at 19).

A few days later Perry was present when Jones gave the gun to his brother. (ECF No. 21-15 at 34.) This testimony was corroborated by the testimony of Jones's brother's girlfriend, Holly Noggle, who testified that she took the gun and hid it at her sister's house, later taking it to her own house. (ECF No. 21-15 at 50-52.) Noggle then returned the gun to her sister's house, where police, with Noggle's cooperation, recovered it. (ECF No. 21-15 at 57-58, 62-63.)

Percy Morgan was incarcerated in the Milwaukee County Jail with Jones as Jones awaited trial and testified that Jones told him that he shot a guy. (ECF No. 21-16 at 8-9.) On cross-examination, Morgan stated that Jones got a tattoo while in jail, "like with Killer Chris on his arm and like after killing a person." (ECF No. 21-16 at 15.)

Mark Simonson, a firearm and toolmark examiner with the State Crime Laboratory in Milwaukee, testified that he examined the .25 caliber semi-automatic pistol the police recovered from Noggle's sister's house. (ECF No. 21-16 at 85-87.) Simonsen test-fired the recovered handgun and compared the casing it ejected to the casing recovered from the scene of Sprewer's murder. (ECF No. 21-16 at 88-89.) Based upon a comparison of marks on the two casings left by the firing pin and the breach face of the pistol, he opined that the casing recovered from the homicide scene was fired by the recovered handgun. (ECF No. 21-16 at 88-90.) In a similar manner, Simonson opined that the bullet recovered from Sprewer during the autopsy was fired from the recovered handgun. (ECF No. 21-16 at 90-91.) He testified that the recovered bullet and

casing could have come from only this particular firearm, to the exclusion of all other firearms in the world. (ECF No. 21-16 at 89, 91.) On cross-examination, Simonsen stated that there was no error rate or possibility of error in his analysis. (ECF No. 21-16 at 95-96.)

After about 45 minutes of deliberation, the jury found Jones guilty of both murder and attempted armed robbery. (ECF No. 21-19 at 2.)

## III.    Standard of Review

Following the passage of the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal court is permitted to grant relief to a state petitioner under 28 U.S.C. § 2254 only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). This is a "stiff burden." *Jean-Paul v. Douma*, 809 F.3d 354, ___ (7th Cir. 2015). "The state court's ruling must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* at ___ (quoting *Carter v. Douma*, 796 F.3d 726, 733 (7th Cir. 2015)); *see also Harrington v. Richter*, 562 U.S. 86, 102 (2011).

"Clearly established federal law" refers to a holding "of the United States Supreme Court that existed at the time of the relevant state court adjudication on the merits." *Caffey v. Butler*, 802 F.3d 884, 894 (7th Cir. 2015) (citing *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "A decision is 'contrary to' federal law if the state court applied an incorrect rule—i.e., one that 'contradicts the governing law' established by the Supreme Court—or reached an outcome different from the Supreme Court's conclusion in a case with 'materially indistinguishable' facts." *Id.* (quoting *Williams*, 529 U.S. at 405-06). A decision involves an unreasonable application of federal law if the state court identified the correct governing principle but applied that principle in a manner with which no reasonable jurist would agree. *Id.*; *see also Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "A court's application of Supreme Court precedent is reasonable as long as it is 'minimally consistent with the facts and circumstances of the case.'" *Williams v. Thurmer*, 561 F.3d 740, 743 (7th Cir. 2009) (quoting *Schaff v. Snyder*, 190 F.3d 513, 523 (7th Cir. 1999)). Thus, a federal court could have the "firm conviction" that a state court's decision was incorrect but, provided that error is not objectively unreasonable, nonetheless be required to deny the petitioner relief. *Lockyer*, 538 U.S. at 75-76.

Case 2:12-cv-01108-WED   Filed 02/10/16   Page 8 of 21   Document 47

## IV. Analysis

Jones seeks relief on the basis of four claims: two claims of ineffective assistance of trial counsel and two claims he characterizes as alleging violations of due process. First, he argues that he was denied the effective assistance of trial counsel when his trial counsel failed to investigate whether Jones had, in fact, received a "Killer Chris" tattoo. Second, he argues that he was denied the effective assistance of trial counsel when his trial counsel failed to challenge the reliability of firearm and toolmark evidence. Third, he argues that he was denied due process when an unduly suggestive lineup was not suppressed, a claim that was not raised in the appeal of his conviction but raised only as part of his *Knight* petition. Thus, the court must address this claim through the lens of a claim of ineffective assistance of appellate counsel. Finally, he argues that he was denied due process when he was denied the funds for an expert on appeal. The court will address each of these issues in turn.

### A. Ineffective Assistance of Trial Counsel

Under the Sixth Amendment to the United States Constitution, a criminal defendant is entitled to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). A defendant is denied this right if counsel's performance falls below an objective standard of reasonableness and, but for counsel's errors, the result of the proceeding would have been different. *Long v. Butler*, 809 F.3d 299, ___ (7th Cir. 2015). However, when the question of effective assistance of counsel is presented in a

habeas petition under § 2254, the court does not directly apply the *Strickland* standard. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Rather than focusing on the actions of counsel, the federal court focuses on the actions of the state court in applying *Strickland.* The court will grant a habeas petitioner relief only if no fair-minded jurist could find that the state court's decision about whether counsel was ineffective was correct. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, it is not enough that the federal court might find that the state court's decision was incorrect; the federal court must find that it was so far outside of the appropriate range of differences of opinion that it was unreasonable. *Long*, 809 F.3d at ___ (citing *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009)).

### 1. "Killer Chris" Tattoo

As noted above, during cross-examination Morgan testified that Jones got a tattoo while in jail "like with Killer Chris on his arm and like after killing a person." (ECF No. 21-16 at 15.) In closing argument, amidst a brief discussion of Morgan's testimony and while reiterating why Morgan chose to testify, the prosecutor stated, "I come in here because this guy is a killer. Tattoo on his arm. Killer. Killer." (ECF No. 21-17 at 50.) Jones's attorney stated in his closing that if he were going to jail he would get "a couple of those little tattoos that go under the left eye and when people asked me what that meant, it says, I mean, I killed women and children, whatever I would have to

say to back them off." (ECF No. 21-18 at 6.) The prosecutor then returned to the tattoo in rebuttal, stating:

> Apparently what [Jones] did is he put the tattoo Killa on his wrist. That's something to be proud of? That's something that is going to keep people away from you? He did that because he is a Killa and he's proud of it and that's why he did it in the jail.

(ECF No. 21-18 at 12.)

However, at sentencing the court noted that in the information about Jones from the Department of Corrections there was no reference to a tattoo that said "killer." (ECF No. 21-19 at 25.) As a result, the court asked Jones if he had a tattoo that said "killer." (ECF No. 21-19 at 25.) Jones responded, "I don't." (ECF No. 21-19 at 25.) Jones argues that his trial counsel was ineffective for not inquiring whether Jones had such a tattoo.

The Wisconsin Court of Appeals found that Jones's attorney was not ineffective because "[i]f Jones did not have the tattoo on that day, he could have easily told his trial lawyer. Thus, Jones's contention that his lawyer was ineffective for not investigating something that Jones could have revealed to him at the time is wholly without merit." *Jones*, 2010 WI App 133, ¶ 33, 329 Wis. 2d 498, 791 N.W.2d 390 (citing *State v. DeLain*, 2004 WI App 79, ¶ 18, 272 Wis. 2d 356, 368, 679 N.W.2d 562, 568). Jones argues that this conclusion was unreasonable because it fails to consider that, since Morgan's claim regarding the tattoo was contained in a police report, Jones's attorney should have investigated this claim *before* trial. (ECF No. 41 at 8.) Jones also argues that the court of appeals' decision essentially required him to act as his own attorney by interrupting his

attorney during cross-examination and risking being scolded by the court in front of the jury. (ECF No. 41 at 9-10.) The respondent argues that it is possible (even likely) that Jones received a temporary "prison tattoo," and thus that it is possible that Morgan's testimony and Jones's response at sentencing, nine months later, both were truthful. (ECF No. 45 at 16.) But for present purposes the court will presume that Morgan was referring to a traditional, permanent tattoo and that Jones never had any such tattoo.

The court finds that the state court's decision regarding the "Killer Chris" tattoo was not an unreasonable application of *Strickland*. Jones could have told his attorney about the absence of the tattoo once Morgan referred to it. When Jones heard the testimony and said nothing his lawyer, it was not unreasonable for counsel to presume that the testimony was accurate. An attorney is not required to lean over to his client after every answer from a witness and ask, "Is what he said true?" While a defendant is not obligated to represent himself, that does not mean he is relieved from playing any role in his own defense.

Jones further argues that the court of appeals erred when it apparently did not consider whether Jones's attorney should have investigated the existence of the tattoo prior to trial. Even if this court were to conclude that, in light of the reference to the tattoo in a police report of Morgan's interview with police, it was unreasonable for trial counsel to not investigate whether any such tattoo existed, the court finds that Jones was not prejudiced. In the context of the entire trial, Morgan's testimony was minor.

The government's direct examination of Morgan spanned roughly two-and-a-half pages of transcript (ECF No. 21-16 at 8-10) out of a three-day trial. Three independent eyewitnesses, including Jones's co-actor, tied Jones directly to the robbery and murder. Jones's own girlfriend and the girlfriend of his brother each provided powerful circumstantial evidence. With this very strong evidence against Jones, the court has no reason to suspect that, had Jones's attorney successfully demonstrated to the jury that Jones did not have the tattoo that Morgan alleged, or even had Morgan never testified, the outcome would have been any different. Consequently, the court must find Jones is not entitled to relief on this claim.

### 2. Handgun Evidence

On this issue, the court of appeals addressed only the prejudice prong of the *Strickland* analysis, concluding that the evidence against Jones was overwhelming and that the outcome would have been no different had the gun never been found: "assuming that the technician had never testified or, more likely, that Jones's trial lawyer had used the materials Jones proffers to us to attack the validity of the technician's conclusions, we have no doubt but that the result of the trial would have been the same." *Jones*, 2010 WI App 133, ¶ 26.

Jones asserts that at the time of trial "many scholarly journals and academic articles existed that exposed the systematic problems and unreliability of firearm and toolmark identification evidence." (ECF No. 41 at 11 and fn. 4 (citing sources).)

However, he does not explain what ought to have happened had counsel been aware of this literature. He does not assert that Simonsen should have been excluded from testifying, an argument that would be hard to sustain given that at the time Wisconsin law left the reliability of expert witnesses up to the jury, not the court as in the federal system. *Jones*, 2010 WI App 133, ¶ 22. At best, Jones's attorney may have been able to demonstrate through cross-examination that there was doubt as to whether Simonsen's conclusions were as certain as he stated. But even if Jones's attorney succeeded in demonstrating that the recovered handgun was merely one out of some unknown number of firearms that could have been used to shoot Sprewer, the court has no reason to believe that the outcome would have been any different. Aside from three independent eyewitnesses, the government established that Sprewer's death was caused by a .25 caliber bullet, that Jones was in the area of the shooting at the time of the shooting, that he was armed with a .25 caliber handgun that was consistent with a handgun that could have been used in the shooting, that Jones admitted the murder to his girlfriend, and that Jones sought to hide a .25 caliber handgun immediately after the shooting.

The court finds that the court of appeals' conclusion was reasonable.

## B.  Lineup

Jada Carter, the woman who was waiting for the bus and witnessed the murder, viewed a sequential photographic array on September 10, 2006, five days after the

murder. (ECF No. 21-9 at 54.) Jones was in the third position; Carter indicated that the person in the fourth position closely matched one of the actors based upon his facial features and complexion. (ECF No. 21-9 at 56-57, 59.) After viewing the photo array, Carter stated she felt she would be better able to identify the actor if she saw the suspect in person. (ECF No. 21-9 at 57.)

Weeks later, on October 4, 2006, detectives assembled an in-person sequential lineup that included Jones. (ECF No. 21-9 at 61.) Jones, who was in the third position, initially was not identified by Carter. (ECF No. 21-9 at 69.) But once Carter saw the fourth person, she said that the actor was number three—Jones. (ECF No. 21-9 at 69.) She viewed the rest of the six participants and then asked to view the lineup again. (ECF No. 21-9 at 69.) The second time through, once she saw Jones in the third position she said she was positive he was the person she saw standing near Sprewer. (ECF No. 21-9 at 69-70.) Only Jones was presented in both the photo array and the live lineup. (ECF No. 21-9 at 65.)

Although Jones raised this issue in a pretrial motion to suppress (ECF No. 21-9 at 53-74), he did not present it as part of his direct appeal (ECF No. 21-2). The issue was first presented to the court of appeals as part of Jones's *Knight* petition in which Jones argued that his appellate counsel was ineffective for not raising the issue on direct appeal. (ECF No. 21-20.) The court of appeals rejected Jones's *Knight* petition ex parte, noting that Jones's appellate counsel was not required to raise an argument simply

because it rose above the level of frivolity. (ECF No. 21-21 at 3 (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)).) Counsel may choose among possible arguments and select those that she thinks are most likely to succeed. (ECF No. 21-21 at 3 (citing *Smith*, 528 U.S. at 288).)

The court of appeals construed Jones's *Knight* petition as arguing that a lineup was per se suggestive when only the suspect was previously presented in a photo array. (ECF No. 21-21 at 4.) Relying upon its decision in *State v. Benton*, 2001 WI App 81, 243 Wis. 2d 54, 625 N.W.2d 923, the court of appeals rejected this argument and concluded that each case must be assessed individually. (ECF No. 21-21 at 4.) The court of appeals also distinguished a recent decision from the Wisconsin Supreme Court, *State v. Dubose*, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582, and noted that simply because the present lineup was inconsistent with the Wisconsin attorney general's recommendations regarding identifications did not mean it was constitutionally infirm. (ECF No. 21-21 at 5-6.) The court concluded that the lineup argument was not clearly stronger than the arguments she did present on appeal, and consequently Jones's appellate counsel was not ineffective. (ECF No. 21-21 at 6.)

"The general *Strickland* standard governs claims of ineffective assistance of appellate counsel as well as trial counsel but with a special gloss when the challenge is aimed at the selection of issues to present on appeal." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)) (internal citation

16

omitted). "Appellate counsel is not required to raise every non-frivolous issue and her performance 'is deficient under *Strickland* only if she fails to argue an issue that is both 'obvious' and 'clearly stronger' than the issues actually raised.'" *Long v. Butler*, 809 F.3d 299, ___ (7th Cir. 2015) (quoting *Makiel*, 782 F.3d at 898). "Proving that an unraised claim is clearly stronger than a claim that was raised is generally difficult 'because the comparative strength of two claims is usually debatable.'" *Makiel*, 782 F.3d at 898 (quoting *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013)). As for the prejudice prong, a defendant alleging ineffective assistance of appellate counsel cannot satisfy this element unless he can show that the neglected claim was meritorious. *Ashburn v. Korte*, 761 F.3d 741, 751 (7th Cir. 2014).

The strength of the argument and the prejudice prongs both relate to whether the court of appeals would likely have granted relief had the issue been presented on direct appeal. Therefore, as a practical matter, it is often most efficient to focus upon the merits of the argument not pursued which underlies the ineffective assistance of appellate counsel claim.

The court concludes that the Wisconsin Court of Appeals did not unreasonably apply *Strickland* when it found that Jones was not denied the effective assistance of counsel on appeal. As the court of appeals noted, Jones's argument was, in effect, for a per se rule that a lineup is unduly suggestive if the witness had previously seen a photo array and only the defendant was presented in both. (ECF No. 21-21 at 3-4.) The court of

Case 2:12-cv-01108-WED   Filed 02/10/16   Page 17 of 21   Document 47

appeals previously rejected this argument. (ECF No. 21-21 at 4 (citing *Benton*, 2001 WI App 81, ¶ 8).) The circumstances of each case must be assessed individually. *Id.* at ¶ 10.

In assessing the individual circumstances of this case, the court of appeals found that Jones failed to show that the photo array or lineup were unduly suggestive. Jones cites cases finding no constitutional problem when the period between the photo array and the lineup was greater than the twenty-four days here. (ECF No. 41 at 20-21 (citing *United States v. Harris,* 281 F.3d 667, 670-71 (7th Cir. 2002) (six months); *United States v. Carter*, 410 F.3d 942, 949 (7th Cir. 2005) (three months); *United States v. Benabe*, 654 F.3d 753, 774-75 (7th Cir. 2011) (five months) *Benton*, 243 Wis. 2d at 61-62) (sixteen months)). However, what is relevant is whether any Wisconsin court (or the United States Supreme Court) has found equal or greater periods of time constitutionally infirm. Jones has not identified any such authority.

To the contrary, in an unpublished opinion the Wisconsin Court of Appeals found no constitutional infirmity when a victim initially failed to identify the defendant after he was shown two photo arrays, each containing pictures of the defendant, on the same day, but *did* identify the defendant from another array three days later and from a lineup a week thereafter. *State v. Boone*, 1997 Wisc. App. LEXIS 687, 3-4 (unpublished). The court similarly found that an identification was not impermissibly suggestive when a witness was repeatedly shown photos over the course of roughly a month, first identifying a photo of someone other than the defendant, then failing to identify anyone

18

from a photo array, later saying that the defendant's photo looked familiar but not identifying him from another photo array, then failing to identify the defendant from a lineup, and finally, apparently the same day as the lineup, being shown yet another photo array and finally identifying the defendant as the actor. *State v. Carter*, 1994 Wisc. App. LEXIS 555, 4-5 (unpublished).

A check upon the risk of misidentification is a vigorous cross-examination of the eyewitness whereby the jury is presented with the potential for error. *See Simmons v. United States*, 390 U.S. 377, 384 (1968); *United States v. Benabe*, 654 F.3d 753, 775 (7th Cir. 2011). Here, Jones's attorney raised the issue in opening, (ECF No. 21-13 at 57-59), developed the matter on cross-examination (ECF No. 21-14 at 90-99), and argued it in closing (ECF No. 21-17 at 65). The court finds that the court of appeals reasonably concluded that Jones's appellate counsel was not ineffective when she did not argue that Carter's identification was the result of unconstitutionally suggestive procedures.

### C. Expert Witness on Appeal

Finally, Jones argues that he was denied due process when he was denied funding for a second expert to support his claims on appeal that the firearm evidence the state introduced at trial was faulty and that Jones's attorney at trial was ineffective for failing to effectively challenge the firearm evidence. (ECF No. 41 at 22-23.)

The respondent contends that this claim is not properly before the court. The initial decision to deny funding was made by the Office of the State Public Defender

Case 2:12-cv-01108-WED   Filed 02/10/16   Page 19 of 21   Document 47

and based upon state law. (ECF No. 45 at 10.) The court of appeals' decision on this point likewise rested upon state law. (ECF No. 45 at 7.) Matters of purely state law are beyond the purview of federal habeas corpus review. (ECF No. 45 at 10 (citing *United States ex rel. Burnett v. Illinois*, 619 F.2d 668, 671 (7th Cir. 1980); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).) Moreover, Jones fails to identify any decision of the United States Supreme Court that clearly establishes that an indigent defendant is entitled to an expert to assist in his appeal. (ECF No. 45 at 9.)

The absence of any decision of the United States Supreme Court squarely holding that an indigent defendant is entitled to state-funded expert witnesses to support his appeal precludes this court from granting Jones relief on this claim. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the habeas petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." (brackets and internal quotation marks omitted)). The court also notes that there is no reason to believe that an expert would have made any difference in Jones's appeal. As noted above with respect to Jones's related ineffective assistance of counsel claim, and as noted by the court of appeals, *Jones*, 2010 WI App 133, ¶ 42, even if Jones could have shown that the recovered firearm was merely consistent with the weapon used to murder Sprewer, the evidence would have still convincingly established Jones's guilt.

## V.    Conclusion

For the reasons set forth above, the court must deny Jones's petition for a writ of habeas corpus. Finally, the court finds that Jones has not made a substantial showing of the denial of a constitutional right and therefore, in accordance with 28 U.S.C. § 2253(c)(2) and Rule 11 of the Rules Governing Section 2254 Cases, declines to issue him a certificate of appealability. However, should the petitioner wish to appeal, he may request a certificate of appealability from the Court of Appeals for the Seventh Circuit.

**IT IS THEREFORE ORDERED** that Jones's petition for a writ of habeas corpus is denied. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 10th day of February, 2016.

WILLIAM E. DUFFIN
U.S. Magistrate Judge